# In the United States Court of Federal Claims

|  |  |
|---|---|
| REBECCA METZINGER, M.D., | |
| Plaintiff, | No. 23-332 |
| v. | Filed October 28, 2025 |
| THE UNITED STATES, | |
| Defendant. | |

Marie Riccio, Law Offices of Marie Riccio, New Orleans, LA, for plaintiff.

Patrick Angulo, Civil Division, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**
**Granting in part and denying in part the government's motion for summary judgment**

Dr. Rebecca Metzinger seeks back pay, liquidated damages, attorney's fees, and other remedies allowed by law under the Equal Pay Act (29 U.S.C. § 206(d)), for sex-based pay discrimination by her employer, the Department of Veterans Affairs. In October 2024, the court granted in part and denied in part the government's motion to dismiss Dr. Metzinger's complaint, dismissing as time barred her claims covering paychecks issued before May 21, 2016. The government now moves for an early summary judgment, before discovery, arguing that Dr. Metzinger has received all the back pay she is entitled to. Dr. Metzinger challenges the admissibility of the government's evidence of the back pay and argues that she is still entitled to receive liquidated damages and other remedies.

After the court held an oral argument on the motion, Dr. Metzinger requested that the court issue subpoenas to the VA and the Defense Finance and Accounting Service for additional "foun-

dational" documents related to Dr. Metzinger's salary changes and back-pay payments. The government opposes Dr. Metzinger's request, arguing, among other things, that the requested documents have no bearing on the merits of the motion for summary judgment.

There is no genuine factual dispute that the government retroactively paid, and Dr. Metzinger received, all the pay she was owed dating back to June 26, 2016. The back-pay evidence the government relies on is admissible and reliable; Dr. Metzinger provides no evidence that would show that she never received that money; and the "foundational" documents Dr. Metzinger seeks could not affect the court's conclusion regarding that pay.

But, even with that resolved, several issues remain in the case. Dr. Metzinger's Equal Pay Act claim extends a little over a month further back, to May 21, 2016, and the government does not assert that it paid Dr. Metzinger back pay for that additional month. Further, when the government retroactively paid Dr. Metzinger the back pay she was entitled to for June 26, 2016, forward, the government did not satisfy any obligation it might have to pay an additional amount equal to the amount of payment that was delayed, as liquidated damages under the Equal Pay Act; there remains a genuine issue of material fact concerning Dr. Metzinger's entitlement to those liquidated damages. Dr. Metzinger also seeks benefits associated with her back pay, and some benefits issues remain outstanding. And Dr. Metzinger seeks attorney's fees and other costs; the attorney's fees and other costs remain outstanding.

The court will therefore grant the government's motion with respect to Dr. Metzinger's back pay for the period beginning on June 26, 2016, and will deny the government's motion with respect to the other issues that remain in the case. The court will deny Dr. Metzinger's motion for leave to issue subpoenas, but discovery has not yet begun in this case; Dr. Metzinger may seek relevant documents during the discovery process.

## I.    Background

Dr. Metzinger is the chief of ophthalmology at the New Orleans Veterans Medical Center, run by the VA. ECF No. 99 at 4-5 [¶¶6-7]. Dr. Metzinger has served as chief since 2008. *Id.* at 5 [¶7].[1]

According to the complaint, in May 2017, Dr. Metzinger learned that some of her male subordinates were receiving higher salaries than she was. ECF No. 99 at 9-10 [¶13], 17 [¶29]. She also learned that in the nearly ten years she had been at the VA, she should have received market pay panels every other year, or five times, reviewing and adjusting her salary. *Id.* at 17-18 [¶¶28-30]. She alleges that the VA held regular market pay panels and gave market pay increases to her male subordinates in that time. *Id.* at 17 [¶29]; ECF No. 117 at 17. In June 2017, Dr. Metzinger filed a sex discrimination claim with the Equal Employment Opportunity Commission (EEOC). ECF No. 99 at 10 [¶13], 11 [¶16]. She also reported harassment by her male supervisor. *Id.* at 9-10 [¶13].

Around August 2017, Dr. Metzinger received her first market pay panel. ECF No. 138-1 at Appx26-27; ECF No. 146 at 4 (asserting that the panel convened on August 4 and was approved on August 28, 2017); *see also* ECF No. 99 at 18 [¶31] (complaint alleging that the panel took place in September 2017). The panel awarded her a salary increase, from $260,599 to $300,000, retroactive to June 26, 2016, the date that her most recent market pay panel should have convened. ECF No. 138-1 at Appx26-27; Appx50 [59:23-60:12]. Initially, due to a payroll error, the Defense Finance and Accounting Service (DFAS) input Dr. Metzinger's updated salary into the system at a lower rate, but DFAS later corrected the error. The government believes it ultimately fixed the salary retroactively also to June 26, 2016. *Id.* at Appx14, Appx54 [83:9-25]; ECF No. 144-1 at

---

[1] The court's previous opinion, *Metzinger v. United States*, 173 Fed. Cl. 636, 641-45 (2024) (also available at ECF No. 124), gives a more detailed factual and procedural history of this case.

SAppx3 [79:8-12], SAppx4 [123:10-20]. Dr. Metzinger received another market pay panel on February 4, 2019. ECF No. 117-2 at 95-99. That panel retroactively increased her annual salary to $312,000 effective June 24, 2018, the date her 2018 pay panel should have convened. *Id.* at 95.

Between October 2017 and November 2019, DFAS issued, and Dr. Metzinger received, six lump-sum payments, totaling $55,103.16, to cover retroactive market-pay adjustments and correct DFAS's errors. ECF No. 138-1 at Appx97-98. Those payments are documented in a DFAS-produced spreadsheet auditing Dr. Metzinger's payroll history for the relevant years. *Id.* at Appx100-01. The government does not have copies of Dr. Metzinger's leave and earnings statements for those years because the government keeps those documents for only one year; most of Dr. Metzinger's copies, apart from the few in the record, were destroyed in a house fire. ECF No. 144 at 5-6; ECF No. 153 at 8:21-9:20, 78:16-79:7.

Dr. Metzinger filed her Equal Pay Act case in district court on May 21, 2019. ECF No. 1. After the case eventually made its way to this court, the court dismissed Dr. Metzinger's claims covering paychecks issued before May 21, 2016, as outside the Equal Pay Act's statute of limitations. *Metzinger*, 173 Fed. Cl. at 646-51. The court applied a three-year statute of limitations—as opposed to two—because Dr. Metzinger plausibly alleged willfulness. *Id.* The court held that Dr. Metzinger had established a prima facie Equal Pay Act claim for paychecks she received after that date. *Id.* at 652-53.

Despite encouragement to settle the remainder of Dr. Metzinger's claims, the parties were unable to make progress outside of court. Dr. Metzinger filed a second amended complaint (ECF No. 136, supplementing ECF No. 99), and the government moved for summary judgment (ECF No. 138). In August 2025, the court held an oral argument on the government's motion. After the

4

oral argument, Dr. Metzinger requested leave to issue subpoenas to the VA and DFAS, seeking documents about the government's retroactive-pay decisions. ECF No. 146.

## II.    Discussion

The government argues that the record establishes that Dr. Metzinger received all the back pay she was entitled to beginning on June 26, 2016. ECF No. 138 at 4-5, 23. According to the government, Dr. Metzinger (retroactively) had the highest salary in the section beginning on that date, so her Equal Pay Act claim fails; without an Equal Pay Act claim, the government argues, she cannot receive liquidated damages. ECF No. 144 at 18-20.

Dr. Metzinger does not dispute that she received six payments, totaling $55,103.16. ECF No. 141; ECF No. 153 at 53:22-54:7; 73:16-18. She also does not dispute that she received all the back pay she was owed from June 26, 2016, forward, although she argues that she missed out on contributions to the Thrift Savings Plan and other benefits. ECF No. 153 at 73:11-77:2. Dr. Metzinger argues that it is not clear why she received any particular sum of money, and she argues that the DFAS audit spreadsheet of her pay history is inadmissible hearsay. ECF No. 141 at 16-17, 20-23; *see* ECF No. 153 at 48:12-18, 50:20-51:1. She also argues that delayed back-pay corrections do not relieve the government of its obligation under the statute to pay liquidated damages and attorney's fees. ECF No. 141 at 13-15.

The court may grant summary judgment when the movant establishes that the record does not contain a "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rules of the Court of Federal Claims (RCFC), Rule 56(a). When reviewing a motion for summary judgment, "the judge's function is not … to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Disputes over material facts preclude summary

judgment. *Id.* at 248. A fact is material if it might "affect the outcome of the suit under the governing law." *Id.* A dispute is genuine when the evidence could lead a factfinder to reasonably resolve that issue "in favor of either party." *Id.* at 250.

"The party seeking summary judgment has the initial burden of establishing that there is no genuine dispute as to any material fact." *8x8, Inc. v. United States*, 854 F.3d 1376, 1380 (Fed. Cir. 2017). The moving party may meet its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), quotation marks and emphasis omitted). The non-moving party must then respond by showing "an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). When evaluating a summary-judgment motion, the court draws all justifiable inferences and resolves any doubt over the factual issues in the non-movant's favor. *Anderson*, 477 U.S. at 255.

### A.    Back pay

The court will first address Dr. Metzinger's claim for back pay. The arguments on back pay involve the admissibility of the government's spreadsheet, the accuracy of that spreadsheet, and whether Dr. Metzinger has received all the back pay she is entitled to.

### 1.    The DFAS spreadsheet is admissible evidence

To show Dr. Metzinger's pay, including contemporaneous pay, retroactive pay, and benefits, the government relies on a spreadsheet it attaches to its motion. DFAS created the spreadsheet for this litigation. It covers the pay period that began on December 25, 2016, to the pay period that ended on September 7, 2024. ECF No. 138-1 at Appx100-02. The spreadsheet thus shows Dr. Metzinger's pay history for most of the period at issue in this suit. The government explains that DFAS created the spreadsheet by running a "standard report," querying its database for all of Dr.

Metzinger's "payroll information between two dates." ECF No. 144 at 4. The government asserts that the spreadsheet "achieves the same functional purpose as an earning and leave statement, and in fact, … goes into much, much more detail than a leave and earnings statement would." ECF No. 153 at 9:14-17. The government adds that it does not have Dr. Metzinger's original leave and earnings statements because it keeps those for only one year. *Id.* at 9:6-11. Dr. Metzinger argues that the spreadsheet is inadmissible hearsay. ECF No. 141 at 20-22. She argues that it does not qualify as either a business record or a public record under the exceptions to the hearsay rule, and she argues that it was prepared only for litigation purposes, making it not relevant evidence. *Id.* She also argues that the spreadsheet is inadmissible because the government did not also provide its underlying or "foundation" documents, such as leave and earnings statements. *Id.*

The government responds that the spreadsheet is admissible under the business records exception because DFAS maintains payroll data and performs pay audits in the course of its regularly conducted business, and a DFAS supervisor testified to its admissibility. ECF No. 144 at 4-7. The government adds that the spreadsheet is admissible even without the corresponding leave and earnings statements. *Id.* at 5-6.

"Evidence in support of a motion for summary judgment must be of the sort admissible at trial." *Hallwood Plaza, Inc. v. United States*, 84 Fed. Cl. 804, 810 (2008). Thus, the court may grant summary judgment only if the supporting evidence could clearly "be adduced and admitted at trial." *Kandel v. United States*, 115 Fed. Cl. 752, 757 (2014); *see Conoco Inc. v. Department of Energy*, 99 F.3d 387, 394-95 (Fed. Cir. 1997). When there is "no question that the facts contained in [the moving party's evidence] will ultimately be admissible, at trial, under one or more evidentiary rules," the court may consider those facts on summary judgment. *Kandel*, 115 Fed. Cl. at 758.

In contrast, the nonmoving party is not required to "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp.*, 477 U.S. at 324. She "may rely on any evidence that raises" a genuine issue of material fact. *Hallwood Plaza, Inc.*, 84 Fed. Cl. at 810.

The business records exception to the hearsay rule permits a court to rely on records of regularly conducted activity, made at or near the time of the activity. Fed. R. Evid. 803(6); *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1392 (Fed. Cir. 2010). For a business record to be admissible, "a custodian or another qualified witness" must establish that it was made and kept in the course of regularly conducted business activity. Fed. R. Evid. 803(6)(D). The witness is only required to be familiar with the record and understand the system used to prepare it; she does not need to be the person who created or maintained the record. *Conoco Inc.*, 99 F.3d at 391-92. The court assesses "the sufficiency of the foundation evidence … in light of the nature of the documents at issue" and has "broad discretion in determining whether a proper foundation has been laid." *Id.* "Because of the general trustworthiness of regularly kept records and the need for such evidence in many cases," the court generally construes the business records exception "in favor of admissibility." *Id.* at 391.

The government provided a declaration with its spreadsheet, from Misty Wilson, a supervisor in civilian pay operation at DFAS. ECF No. 138-1 at Appx97-102. While Ms. Wilson did not make the spreadsheet, she "reviewed the DFAS audit of Dr. Rebecca Metzinger's … back pay that occurred as a result of a September 2017 Market Pay Panel conducted by the VA" and confirms that Dr. Metzinger received "$55,103.16 in back Market Pay." *Id.* at Appx97 [¶2], Appx98 [¶4]. She explains that, as the supervisor "responsible for supervising the team that processes orders and settlement agreements for back pay awards … for civilian employees and former

8

civil employees," she understands the system that was used to prepare the spreadsheet. *Id.* at Appx97 [¶1]. And she explains that "DFAS routinely prepares audits of payments made pursuant to the Back Pay Act (5 U.S.C. § 5596) in order to show compliance with the Back Pay Act and its implementing regulations," establishing that the government's spreadsheet was made in the regular course of business. *Id.* at Appx97 [¶2].

Payroll compilation records regularly made by an employer, like the spreadsheet, submitted with a declaration by a payroll supervisor, like Ms. Wilson, are commonly considered admissible business records. *United States v. Croft*, 750 F.2d 1354, 1364-65 (7th Cir. 1984); *see also, e.g.*, *United States v. Turner*, 189 F.3d 712, 720-21 (8th Cir. 1999); *Allision v. Dolich*, 148 F. Supp. 3d 1142, 1145-46 (D. Or. 2015); *Dunn v. Hunting Energy Services*, 288 F. Supp. 3d 749, 761 (S.D. Tex. 2017). This court has accepted government payroll records as admissible evidence on summary judgment even without any declaration. *Kandel*, 115 Fed. Cl. at 757-58. While the spreadsheet was made for this litigation, all the data in it comes from records made in the ordinary course of business. ECF No. 138-1 at Appx97 [¶2]; *see Kandel*, 115 Fed. Cl. at 758.

Dr. Metzinger's objections to the spreadsheet focus on its "nearly indecipherable" content and the fact that she does not know why or how DFAS was instructed to provide back pay at the times that it did. ECF No. 141 at 20-22. Neither of those objections amounts to a dispute about the veracity of the spreadsheet. And she does not dispute that she received the back-pay payments listed on the spreadsheet. ECF No. 153 at 73:13-18; *see id.* at 58:8-9. Because there is no genuine issue of material fact about the veracity of the spreadsheet, and the government has shown that it is an ordinary business record reflecting Dr. Metzinger's pay, the DFAS spreadsheet is admissible on summary judgment as evidence of all pay the VA gave Dr. Metzinger for her work between December 25, 2016, and September 7, 2024.

> **2.      Dr. Metzinger received the total amount of back pay she was owed back to June 26, 2016, although there remains a question about benefits**

Dr. Metzinger does not dispute that the government paid her back pay in six installments between October 2017 and November 2019 totaling $55,103.16. ECF No. 153 at 73:16-18. Dr. Metzinger at times disputes whether that total of $55,103.16 accounts for all the back pay she was owed. *See* ECF No. 153 at 53:2-7; 57:9-20; 58:8-11; 59:22-60:3; *but see id.* at 53:22-54:4 ("I'm not disputing that her pay was increased … to 300,000 by virtue of the … August 2017" market pay panel.). She does not dispute that an annual salary of $300,000, if she was in fact paid that, was the highest in her section. ECF No. 99 at 18 [¶31]; *see* ECF No. 141 at 1, 3-4.

Dr. Metzinger's salary primarily consists of two types of pay: "regular pay" and "market pay." ECF No. 138-1 at Appx100-02 (columns RA and ZK, respectively). The two categories of pay increased on different dates. Regular, or base, pay typically increases once a year, in early January, when the government provides a cost-of-living adjustment. ECF No. 153 at 35:2-9; 39:15-24. Market-pay increases occur separately, at a different time for each employee. *Id.* at 35:2-9. For Dr. Metzinger, market-pay increases were scheduled for late June. *See id.* Dr. Metzinger's market-pay increases, and the six retroactive payments she received, fall under the "market pay" category. ECF No. 138-1 at Appx100-01 (column ZK).[2]

---

[2] There are other types of pay that are considered part of Dr. Metzinger's salary, but they are not at issue here. It is simplest to focus on the market-pay component of Dr. Metzinger's salary, without the regular-pay component. In the relevant period, Dr. Metzinger received cost-of-living adjustments, and she does not dispute those amounts. Those adjustments increased only her regular pay. ECF No. 138-1 at Appx100-02 (column RA). For example, from June 26, 2016, through September 16, 2017, Dr. Metzinger's market pay was frozen, while her regular pay increased in January 2017. Thus, her total gross pay increased in January 2017, but it had nothing to do with the market pay panels she is disputing. *Id.* at Appx100.

The market pay panel held in August 2017 purported to increase Dr. Metzinger's total annual salary to $300,000. ECF No. 138-1 at Appx26-27. The government made that increase effective June 26, 2016, the date that the government argues the pay panel should have been convened. *Id.* at Appx50 [59:23-60:12]. The change increased the market-pay component of Dr. Metzinger's annual salary from $146,182, or $5,622.38 per paycheck (ECF No. 138-1 at Appx13), to $185,583, or $7,137.81 per paycheck (*id.* at Appx14).[3]

A few months after the pay panel recommendation, DFAS issued Dr. Metzinger three back-pay payments—two in October 2017 and one in January 2018. ECF No. 138-1 at Appx100 (spreadsheet listing the first disbursement on September 30, 2017, the last day of the two-week pay period it covers; paychecks are issued six days later); *see also* ECF No. 141-2 at 8 (leave and earnings statement for October 6, 2017, showing the first disbursement). Those three payments were intended to retroactively pay Dr. Metzinger her higher salary back to the effective date set by the panel. *See* ECF No. 138 at 13-14; ECF No. 138-1 at Appx100-01. The government paid Dr. Metzinger $1,471.40 per paycheck for the 32 pay periods at issue between June 26, 2016, and September 16, 2017, for a total of $47,084.80. ECF No. 138-1 at Appx100.

Those three payments are shown in the government's spreadsheet and copied below. The first row of each payment (highlighted, and dated September 30, 2017, October 14, 2017, and

---

[3] I calculated the per-paycheck component by dividing the yearly total by 26 pay periods per year. In fact, DFAS has calculated the per-paycheck component in slightly different ways at different times, resulting in slightly different numbers. In 2016, 2017, and 2018, DFAS calculated paychecks by dividing the yearly total by 26 pay periods using a daily rate; its totals vary from mine by a few cents. ECF No. 153 at 28:8-23; *see* ECF No. 138-1 at Appx100-101 (showing a payment of $7137.76 instead of $7137.81, or a difference of five cents; also showing $5622.40 instead of $5622.38, or a difference of two cents in the other direction). In 2019, DFAS switched to an hourly rate, slightly changing the total for each paycheck. ECF No. 153 at 28:8-23. Going forward, I will use the government's totals where they vary from mine by only a few cents.

January 6, 2017) shows, in column ZK, the market-pay element for that paycheck. Subsequent

rows show an "adjustment date," or the date an additional portion of the payment covers, and the

corresponding back pay. Thus, for example, for the payment labeled September 30, 2017, Dr.

Metzinger received a total market pay of $15,817.10, or the sum of the seven applicable market-

pay rows. That total is reflected in Dr. Metzinger's leave and earnings statement. ECF No. 141-2

at 8 (showing $8,723.30 in retroactive earnings and $7,093.80 in market pay).

| Pay Period | *Indicates unbalanced cell(s) Adjustment Date | Adjust. Code | Seq. No. | RA Regular Pay | ZK Market Pay | AA Gross Pay |
|---|---|---|---|---|---|---|
| 09/30/17 | | | | 4,444.72 | 7,093.80 | 11,538.52 |
| | 07/08/17 | | | | 1,366.30 | 1,366.30 |
| | 07/22/17 | | | | 1,471.40 | 1,471.40 |
| | 08/05/17 | | | | 1,471.40 | 1,471.40 |
| | 08/19/17 | | | | 1,471.40 | 1,471.40 |
| | 09/02/17 | | | | 1,471.40 | 1,471.40 |
| | 09/16/17 | | | | 1,471.40 | 1,471.40 |
| 10/14/17 | | | | 4,444.72 | 7,093.80 | 11,538.52 |
| | 10/01/16 | | | | 1,471.40 | 1,471.40 |
| | 10/15/16 | | | | 1,471.40 | 1,471.40 |
| | 10/29/16 | | | | 1,471.40 | 1,471.40 |
| | 11/12/16 | | | | 1,471.40 | 1,471.40 |
| | 11/26/16 | | | | 1,471.40 | 1,471.40 |
| | 12/10/16 | | | | 1,471.40 | 1,471.40 |
| | 12/24/16 | | | | 1,471.40 | 1,471.40 |
| | 01/07/17 | | | | 1,471.40 | 1,471.40 |
| | 01/21/17 | | | | 1,471.40 | 1,471.40 |
| | 02/04/17 | | | | 1,471.40 | 1,471.40 |
| | 02/18/17 | | | | 1,471.40 | 1,471.40 |
| | 03/04/17 | | | | 1,471.40 | 1,471.40 |
| | 03/18/17 | | | | 1,471.40 | 1,471.40 |
| | 04/01/17 | | | | 1,471.40 | 1,471.40 |
| | 04/15/17 | | | | 1,471.40 | 1,471.40 |
| | 04/29/17 | | | | 1,471.40 | 1,471.40 |
| | 05/13/17 | | | | 1,471.40 | 1,471.40 |
| | 05/27/17 | | | | 1,471.40 | 1,471.40 |
| | 06/10/17 | | | | 1,471.40 | 1,471.40 |
| | 06/24/17 | | | | 1,471.40 | 1,471.40 |
| | 07/08/17 | | | | 105.10 | 105.10 |
| | 09/30/17 | | | | | 0.00 |
| 01/06/18 | | | | 4,444.72 | 7,093.80 | 11,538.52 |
| | 07/09/16 | | | | 1,471.40 | 1,471.40 |
| | 07/23/16 | | | | 1,471.40 | 1,471.40 |
| | 08/06/16 | | | | 1,471.40 | 1,471.40 |
| | 08/20/16 | | | | 1,471.40 | 1,471.40 |
| | 09/03/16 | | | | 1,471.40 | 1,471.40 |
| | 09/17/16 | | | | 1,471.40 | 1,471.40 |

*See* ECF No. 138-1 at Appx100 (modified here, hiding sections and adding yellow highlighting,

using the native Excel spreadsheet the government provided).

But the additional pay Dr. Metzinger received ($47,084.80) was not the total retroactive

pay she was entitled to; DFAS input the wrong market-pay rate into the system after the 2017

market pay panel. *See* ECF No. 138-1 at Appx14. Instead of setting her market pay at $7,137.76

per paycheck, DFAS input $7,093.80 per paycheck, initially setting her total annual salary at $298,854 instead of $300,000. *Id.* at Appx100-01.[4] Thus, Dr. Metzinger received $47,084.80, or $1,406.72 less than the total $48,491.52 she should have received in market pay.

It took DFAS years to realize this error and, thus, DFAS paid Dr. Metzinger less than she was entitled to, both retroactively and contemporaneously, from June 26, 2016, until March 16, 2019. ECF No. 138-1 at Appx14, Appx54 [83:9-25]; ECF No. 144-1 at SAppx3 [79:8-12]; SAppx4 [123:10-20]; *see* ECF No. 141-1 at 1 [¶3] (Dr. Metzinger noting the incorrect retroactive pay). To fix the error, the government made two corrective payments, in April and November 2019, retroactively compensating Dr. Metzinger for the difference. ECF No. 148-1 at 67; ECF No. 138-1 at Appx98 [¶3], Appx100-01.

Specifically, on November 1, 2019, the government paid Dr. Metzinger a total of $1,406.72, or $43.96 for each of the 32 pay periods, from June 26, 2016, to September 16, 2017, that it had previously underpaid her when issuing the earlier retroactive payments. ECF No. 138-1 at Appx101 (labeled as October 26, 2019, the last date of that pay period); *see id.* at Appx98 [¶3]. That amount, $1,406.72, is the difference between $7,137.76 and $7,093.80, multiplied by 32 pay periods.

---

[4] The government does not explain why DFAS input an annual salary of $298,854, a seemingly arbitrary amount, instead of $300,000. ECF No. 138-1 at Appx14 (corrected SF-50); ECF No. 153 at 32:8-18 ("[I]t was some administrative error and, frankly, I'm not sure how that happened."). It appears from the record that the error could have arisen due to an error on the market pay panel document: The government lists $115,563 (base, or regular, pay) and $184,437 (market pay) as the two components of Dr. Metzinger's $300,000 salary. But Dr. Metzinger's base pay in 2016, before the cost-of-living adjustment, was $114,417. It was not $115,563 until January 2017. So Dr. Metzinger's market-pay rate should have been $185,583, effective June 26, 2016. ($300,000 - $114,417 = $185,583.) This is reflected in her corrected SF-50. ECF No. 138-1 at Appx14. Government employees should not have to check their leave and earnings statements so assiduously to avoid being injured by that sort of mistake. Regardless, as discussed here, DFAS seems to have corrected that error in Dr. Metzinger's case.

The government also accounted for that error, which continued after September 16, 2017, in part of that November payment and in an earlier payment, issued in April 2019. The government continued to underpay Dr. Metzinger by $43.96 per paycheck for another 39 paychecks, from September 17, 2017, until March 16, 2019, when DFAS finally corrected Dr. Metzinger's market pay, setting it to $7,137.76. ECF No. 138-1 at Appx101. The government's spreadsheet shows that the payment issued on April 5, 2019, covers 31 of those pay periods, and the payment issued on November 1, 2019, covers the other 8 pay periods. *Id.* at Appx100-01. Thus, the government compensated Dr. Metzinger fully for its ongoing error.

The aspects of the government's spreadsheet relevant to the 2019 adjustments are shown in the excerpts below.

| Pay Period | *Indicates unbalanced cell(s) Adjustment Adjust. Date Code | Seq. No. | RA Regular Pay | ZK Market Pay | AA Gross Pay |
|---|---|---|---|---|---|
| 03/30/19 | | | 4,639.60 | 7,137.76 | 15,527.36 |
| | 01/20/18 | | | | 43.96 |
| | 02/03/18 | | | | 43.96 |
| | 02/17/18 | | | | 43.96 |
| | 03/03/18 | | | | 43.96 |
| | 03/17/18 | | | | 43.96 |
| | 03/31/18 | | | | 43.96 |
| | 04/14/18 | | | | 43.96 |
| | 04/28/18 | | | | 43.96 |
| | 05/12/18 | | | | 43.96 |
| | 05/26/18 | | | | 43.96 |
| | 06/09/18 | | | | 43.96 |
| | 06/23/18 | | | | 43.96 |
| | 07/07/18 | | | | 43.96 |
| | 07/21/18 | | | | 43.96 |
| | 08/04/18 | | | | 43.96 |
| | 08/18/18 | | | | 43.96 |
| | 09/01/18 | | | | 43.96 |
| | 09/15/18 | | | | 43.96 |
| | 09/29/18 | | | | 43.96 |
| | 10/13/18 | | | | 43.96 |
| | 10/27/18 | | | | 43.96 |
| | 11/10/18 | | | | 43.96 |
| | 11/24/18 | | | | 43.96 |
| | 12/08/18 | | | | 43.96 |
| | 12/22/18 | | | | 43.96 |
| | 01/05/19 | | | | 43.96 |
| | 01/19/19 | | | | 43.96 |
| | 02/02/19 | | | | 43.96 |
| | 02/16/19 | | | | 43.96 |
| | 03/02/19 | | | | 43.96 |
| | 03/16/19 | | | | 43.96 |

| Pay Period | *Indicates unbalanced cell(s) Adjustment Adjust. Date Code | Seq. No. | RA Regular Pay | ZK Market Pay | AA Gross Pay |
|---|---|---|---|---|---|
| 10/26/19 | | | 4,704.80 | 7,360.00 | 12,064.80 |
| | 07/09/16 | | | | 43.96 |
| | 07/23/16 | | | | 43.96 |
| | 08/06/16 | | | | 43.96 |
| | 08/20/16 | | | | 43.96 |
| | 09/03/16 | | | | 43.96 |
| | 09/17/16 | | | | 43.96 |
| | 10/01/16 | | | | 43.96 |
| | 10/15/16 | | | | 43.96 |
| | 10/29/16 | | | | 43.96 |
| | 11/12/16 | | | | 43.96 |
| | 11/26/16 | | | | 43.96 |
| | 12/10/16 | | | | 43.96 |
| | 12/24/16 | | | | 43.96 |
| | 01/07/17 | | | | 43.96 |
| | 01/21/17 | | | | 43.96 |
| | 02/04/17 | | | | 43.96 |
| | 02/18/17 | | | | 43.96 |
| | 03/04/17 | | | | 43.96 |
| | 03/18/17 | | | | 43.96 |
| | 04/01/17 | | | | 43.96 |
| | 04/15/17 | | | | 43.96 |
| | 04/29/17 | | | | 43.96 |
| | 05/13/17 | | | | 43.96 |
| | 05/27/17 | | | | 43.96 |
| | 06/10/17 | | | | 43.96 |
| | 06/24/17 | | | | 43.96 |
| | 07/08/17 | | | | 43.96 |
| | 07/22/17 | | | | 43.96 |
| | 08/05/17 | | | | 43.96 |
| | 08/19/17 | | | | 43.96 |
| | 09/02/17 | | | | 43.96 |
| | 09/16/17 | | | | 43.96 |
| | 09/30/17 | | | | 43.96 |
| | 10/14/17 | | | | 43.96 |
| | 10/28/17 | | | | 43.96 |
| | 11/11/17 | | | | 43.96 |
| | 11/25/17 | | | | 43.96 |
| | 12/09/17 | | | | 43.96 |
| | 12/23/17 | | | | 43.96 |
| | 01/06/18 | | | | 43.96 |

*See* ECF No. 138-1 at Appx100-01 (excerpted, yellow highlighting added).

Dr. Metzinger received one other, sixth, back-pay payment on May 17, 2019. ECF No. 138-1 at Appx101. It came after a market pay panel, held on February 2, 2019, retroactively increased her annual market pay from $185,583 (or $7,137.76 per paycheck) to $191,370 (or $7,360.36 per paycheck), effective June 24, 2018, the date her 2018 pay panel should have been held. ECF No. 117-2 at 95. Thus, the government owed Dr. Metzinger a total of $4,897.20, or $222.60 for each of the 22 pay periods between the effective date of the panel's decision and the date DFAS input the new market-pay salary in its system (April 28, 2019). The spreadsheet shows that the May 2019 payment covered that difference for all 22 pay periods. ECF No. 138-1 at Appx101; *see id.* at Appx98 [¶3].

| Pay Period | Adjustment Date | Adjust. Code | Seq. No. | RA Regular Pay | ZK Market Pay | AA Gross Pay |
|---|---|---|---|---|---|---|
| | | | | | *Indicates unbalanced cell(s) | |
| 05/11/19 | | | | 4,704.56 | 7,360.36 | 12,064.92 |
| | 07/07/18 | | | | 222.60 | 222.60 |
| | 07/21/18 | | | | 222.60 | 222.60 |
| | 08/04/18 | | | | 222.60 | 222.60 |
| | 08/18/18 | | | | 222.60 | 222.60 |
| | 09/01/18 | | | | 222.60 | 222.60 |
| | 09/15/18 | | | | 222.60 | 222.60 |
| | 09/29/18 | | | | 222.60 | 222.60 |
| | 10/13/18 | | | | 222.60 | 222.60 |
| | 10/27/18 | | | | 222.60 | 222.60 |
| | 11/10/18 | | | | 222.60 | 222.60 |
| | 11/24/18 | | | | 222.60 | 222.60 |
| | 12/08/18 | | | | 222.60 | 222.60 |
| | 12/22/18 | | | | 222.60 | 222.60 |
| | 01/05/19 | | | | 222.60 | 222.60 |
| | 01/19/19 | | | | 222.60 | 222.60 |
| | 02/02/19 | | | | 222.60 | 222.60 |
| | 02/16/19 | | | | 222.60 | 222.60 |
| | 03/02/19 | | | | 222.60 | 222.60 |
| | 03/16/19 | | | | 222.60 | 222.60 |
| | 03/30/19 | | | | 222.60 | 222.60 |
| | 04/13/19 | | | | 222.60 | 222.60 |
| | 04/27/19 | | | | 222.60 | 222.60 |

*See* ECF No. 138-1 at Appx101 (excerpted, yellow highlighting added).

Dr. Metzinger does not dispute any of the government's calculations on those six payments. There is no genuine issue of material fact with respect to the government's math. After the 2017 market pay panel, the government owed Dr. Metzinger $48,491.52 in market pay. The first three

back-pay payments plus part of the November 2019 payment total that amount. ($47,084.80 + $1,406.72 = $48,491.52.) After that, the government still owed Dr. Metzinger $1,714.44 for its input error. The April 2019 payment and the remainder of the November 2019 payment cover that balance. ($1,362.76 + $351.68 = $1,714.44.) And after a 2019 market pay panel retroactively increased her market pay, the government paid her the difference for all 22 affected pay periods ($4,897.20). In total, the government owed and Dr. Metzinger was paid $55,103.16 in market pay.[5]

Dr. Metzinger also argues that it is unclear whether the government gave her all the benefits she was owed when it issued the six back-pay payments. ECF No. 141 at 11, 20, 22-23. The government demonstrates that there is no genuine issue of material fact that it correctly deducted Dr. Metzinger's Thrift Savings Plan (TSP) contributions. The government did not deduct TSP contributions from her back-pay payments because she had opted for a fixed-dollar TSP contribution per paycheck rather than a percent contribution. ECF No. 144 at 6; ECF No. 153 at 19:19-20:1. Those fixed amounts had already been deducted from each original paycheck. *See* ECF No. 138-1 at Appx100-101. The spreadsheet shows that Dr. Metzinger elected to contribute $500 per pay period between December 25, 2016, and September 2, 2017; $600 per pay period between September 3, 2017, and September 28, 2019; and $650 per pay period between September 29, 2019, and August 29, 2020. *Id.* Although the spreadsheet does not show Dr. Metzinger's pay periods before December 25, 2016, Dr. Metzinger does not materially dispute the fact that she had opted to contribute a fixed amount to TSP. *See* ECF No. 153 at 69:22-26, 74:23-75:3.

---

[5] The spreadsheet shows that Dr. Metzinger received an additional lump-sum payment on May 3, 2019, for adjustments to her regular pay ($64.96 per paycheck) covering seven pay periods between January 6 and April 13, 2019. In the oral argument, the government clarified the purpose of the payment: In 2019, "the government did not process the [cost-of-living adjustment] until April … so everybody got their increase in April" retroactive "to January." ECF No. 153 at 37:2-23.

There is a genuine issue of material fact, however, over whether Dr. Metzinger received all the additional benefits she was owed, including some of the government's contributions to TSP on her behalf. Those benefits are typically calculated as percentages of an employee's gross salary. *See* ECF No. 153 at 20:6-12, 21:22-22:13 (government explaining that its part of TSP contributions is percentage based). The government is correct that for all the back pay covered by the two October 2017 payments, the government made its TSP contributions. ECF No. 138-1 at Appx100 (columns UD and UI). But, for example, the spreadsheet shows that the government applied no employer or agency TSP contributions, or any other employer benefit contributions, to the January 2018 back-pay payment. *Id.* The spreadsheet also shows that the government applied employee deductions and employer contributions for only some of the pay periods for which Dr. Metzinger received back pay under the six lump-sum payments. *Id.* Those benefits include FERS (columns WP and UCK), FEGLI (columns WG and UG); Medicare (columns WB and UF), and OASDI (columns WM and UJ). While it is not clear that any of the missing benefits would materially affect Dr. Metzinger's financial situation, it is also unclear why the government would treat those benefits differently for some paychecks than for others. The government does not explain why it paid only some of the employer TSP contributions. *See* ECF No. 153 at 20:2-12, 21:22-22:13. Nor does it address why it applied only some of the other benefits to Dr. Metzinger's back pay. *See id.*; ECF No. 144 at 6. Because the government has not explained the discrepancies in benefits, it is not entitled to summary judgment on the benefits aspect of Dr. Metzinger's complaint.

Dr. Metzinger also argues that the spreadsheet and the few documents the government has produced do not clearly establish what each lump-sum payment accounts for. *See* ECF No. 141 at 20-22 (arguing that the spreadsheet "does not substitute for direct evidence as exists in Earnings statements / pay stubs"); ECF No. 153 at 41:22-42:2, 48:10-49:2, 50:20-51:1, 53:25-54:7. The

court is sympathetic to Dr. Metzinger's concern that the spreadsheet is confusing and does not make clear what each lump sum accounts for. The court, like Dr. Metzinger (*see* ECF No. 141 at 20), is also puzzled that DFAS keeps leave and earnings statements for only one year. But neither of those concerns creates a genuine issue of material fact here. The government's attorney and a DFAS representative walked through the spreadsheet at the oral argument, showing how the government calculated each dollar of back pay. Regardless of how each sum was allocated, there is no genuine dispute that Dr. Metzinger received all the back pay that would raise her annual salary to $300,000, retroactive to June 26, 2016.

Finally, Dr. Metzinger argues that the VA told her that a previous pay audit revealed that the government owed her $59,099.04 in back pay, approximately $4,000 more than it ultimately paid her. ECF No. 99 at 19 [¶32]; ECF No. 141 at 8. At the oral argument, the government acknowledged that those calculations were "some pretty disappointing mistakes" because "the VA was using … the wrong number of pay periods per year. … They were using the same market pay, they were using the same dates, but what they were not using was the correct number of pay periods per the calendar year." ECF No. 153 at 40:1-14. But the spreadsheet and additional salary evidence establish that the government paid Dr. Metzinger for the two pay panel adjustments and corrections to DFAS's input error. Thus, there is no factual dispute that by November 2019, the government paid, and Dr. Metzinger received, the total salary pay she was entitled to back to June 26, 2016. The only genuine issue of material fact involving Dr. Metzinger's back pay going back to that date involves benefits.

### 3. There is a genuine issue of material fact as to whether Dr. Metzinger was entitled to or received back pay between May 21 and June 26, 2016

This court's earlier opinion in this case, granting in part and denying in part the government's motion to dismiss, held that Dr. Metzinger had established a prima facie case for Equal Pay

Act claims on paychecks issued on and after May 21, 2016. *Metzinger*, 173 Fed. Cl. at 646-53. On this motion the government does not argue, nor does the record show, that Dr. Metzinger received any back pay before June 26, 2016. ECF No. 138 at 1. Thus, there remains a question whether Dr. Metzinger was paid enough between May 21 and June 26, 2016, to avoid an Equal Pay Act violation. The government acknowledges that for the "one-month period between June 26th and May 21st … it's perhaps beyond dispute that she was paid less than her male counterparts." ECF No. 153 at 16:6-10. The evidence on the government's summary-judgment motion does not resolve Dr. Metzinger's back-pay claim for that additional month. Likewise, it remains an open question whether Dr. Metzinger might be entitled to liquidated damages for that month, under the 29 U.S.C. § 216(b). *See infra* Part II.B. Thus, the court denies summary judgment as to Dr. Metzinger's Equal Pay Act back-pay claims arising from paychecks issued between May 21 and June 26, 2016.

Dr. Metzinger reprises an argument that she is entitled to back pay dating back to May 2014, three years before she filed her EEOC claim. ECF No. 141 at 11, 24-25; ECF No. 146 at 2-3, 5-7; ECF No. 155 at 5. She alludes to market pay panels and pay issued even earlier, in 2008, 2010, and 2012. ECF No. 155 at 7, 12. And she argues that she is entitled to a longer, six-year statute of limitations. ECF No. 155 at 18. But the court already addressed that issue in resolving the motion to dismiss. *Metzinger*, 173 Fed. Cl. at 646-49, 651-52. Dr. Metzinger may appeal that decision, but she cannot act as if the issue remains open in front of this court. Any claim for back pay that covers the period before May 21, 2016, remains time barred in this court.

### B.    Liquidated damages

Dr. Metzinger argues that, beyond the back pay itself, she is entitled to an additional amount equal to the back pay she was owed, as liquidated damages under 29 U.S.C. § 216(b). She argues for those liquidated damages for every discriminatory paycheck she received, at least within the limitations period, even if she already received the back pay itself. ECF No. 141 at 13-15. She

adds that the government owes those liquidated damages even on back-pay payments the government issued before she filed suit. She alleges that Equal Pay Act violations accrue on the date of the discriminatory paycheck and are not mooted by retroactive pay. And, according to Dr. Metzinger, the government has not met its burden of showing that it acted in good faith and on a reasonable belief that it was not violating the law, the only ways the government could avoid paying liquidated damages under the Equal Pay Act. *Id.* at 13-15.

The government responds that the court cannot award liquidated damages because Dr. Metzinger was the highest-paid employee in her section, retroactive to June 26, 2016. ECF No. 144 at 18. The government adds that the earlier underpayments were "the result of an administrative error that inadvertently delayed" the market pay panel by fourteen months from June 2016 to August 2017. *Id.* at 18-19. The government also argues that it was acting in good faith when it underpaid Dr. Metzinger from June 26, 2016, onward and thus is not required to pay Dr. Metzinger liquidated damages. *Id.* at 19. While Dr. Metzinger's 2016 market pay panel was held fourteen months late, the government notes that it occurred only three months after Dr. Metzinger brought her pay-discrimination concerns to human resources. *Id.* at 19-20.

Under 29 U.S.C. § 216(b), "[a]ny employer who violates the provisions of section 206 … of this title shall be liable to the employee … affected in the amount of their unpaid minimum wages … and in an additional equal amount as liquidated damages." The mandate to award liquidated damages under section 216 is qualified by section 260, which provides that "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that [the employer] had reasonable grounds for believing that [its] act or omission was not a violation of the [act], … the court may, in its sound discretion, award no liquidated damages

or award any amount thereof not to exceed the amount specified in section 216." 29 U.S.C. § 260. That discretion is available only when the employer meets its burden.

As summarized by the Department of Labor's regulations interpreting the Fair Labor Standards Act (FLSA), which includes the Equal Pay Act, if the employer does not meet its burden by showing good faith and a reasonable belief that it was not violating the law, the court has no discretion to limit or deny liquidated damages. 29 C.F.R. § 790.22. Even if the employer meets its burden, it is still within the court's discretion to grant, in part or in full, liquidated damages. *Ellison v. United States*, 25 Cl. Ct. 481, 489, 499 (1992). There is a "presumption in favor of the employee receiving liquidated damages." *Id.* at 489; *see Kinney v. District of Columbia*, 994 F.2d 6, 12 (D.C. Cir. 1993) ("double damages are the norm, single damages the exception" (quotation marks omitted)).

"It is easier for a plaintiff to receive liquidated damages … than it is to extend the statute of limitations" from two years to three, which requires a showing of willfulness. *Bankston v. State of Illinois*, 60 F.3d 1249, 1254 (7th Cir. 1995); *see Scalia v. Employer Solutions Staffing Group, LLC*, 951 F.3d 1097, 1102-03 (9th Cir. 2020) (explaining that if an employee establishes that the violation was "willful" then the employer could not have acted in good faith, and the court must award liquidated damages, but that the converse is not true). The court already held that Dr. Metzinger has established a prima facie case for Equal Pay Act claims covering paychecks issued on and after May 21, 2016, because she has made a prima facie showing that the government acted willfully. *Metzinger*, 173 Fed. Cl. at 646-53. While the requirements for willfulness and for liquidated damages are not the same, having plausibly met the higher burden, it is plausible that she can also meet the lower burden.

The government argues that Dr. Metzinger (retroactively) became the highest-paid employee in the section on the effective date of the pay panel decision, June 26, 2016. The government thus argues that she can no longer establish a prima facie case for liquidated damages for that period. That argument is wrong.

While Dr. Metzinger received a higher salary *effective* June 26, 2016, she did not *become* the highest-paid employee until she was actually paid that salary. That did not occur until October 2017 at the earliest, when the government began issuing back-pay payments, or November 1, 2019, at the latest, when she received the last of her back-pay payments, a date that was after she filed this suit. ECF No. 138-1 at Appx100-01. The court already explained that the back-pay correction making Dr. Metzinger the highest-paid employee in the section "does not address the alleged underpayments she received between May 2016" and the date her salary was eventually corrected. *Metzinger*, 173 Fed. Cl. at 653.

Dr. Metzinger can still recover liquidated damages even though she has since received the back pay to correct those violations. The government has an obligation under the FLSA and Equal Pay Act to pay its employees fully and on time. *Avalos v. United States*, 54 F.4th 1343, 1349 (Fed. Cir. 2022) (citing *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 707 (1945)). The courts have interpreted that obligation as generally requiring the government to pay the correct pay by the employee's regular payday. *Id.* at 1349-50; 29 C.F.R. § 790.21(b) ("[A] cause of action under the Fair Labor Standards Act … and for liquidated damages 'accrues' when the employer fails to pay the required compensation for any workweek at the regular pay day for the period."); *Biggs v. Wilson*, 1 F.3d 1537, 1540 (9th Cir. 1993) (collecting cases).

Even if the pay deficiency is later cured—and even if done before the suit is filed—the untimely payment itself may still constitute an Equal Pay Act violation sufficient to warrant liquidated damages. Section 216(b) "provides absolutely that the employer shall be liable for liquidated damages in an amount equal to minimum wages overdue; liability is not conditioned on default at the time suit is begun." *Brooklyn Savings Bank*, 324 U.S. at 707; *see Biggs*, 1 F.3d at 1541-43 (holding that the plaintiff could recover liquidated damages not only on unpaid wages but also on untimely paid wages); *Roland Electric Co. v. Black*, 163 F.2d 417, 421 (4th Cir. 1947) (agreeing with the district court that the employer's attempt to later cure underpayments did not alleviate the employer's obligation to pay liquidated damages under section 216(b)); *Atlantic Co. v. Broughton*, 146 F.2d 480, 482 (5th Cir. 1944) (holding that the obligation to pay liquidated damages arose on the date that money should have been paid and that a later payment of the balance of wages owed, even if "made prior to suit, does not release the accrued liability for liquidated damages").

"[T]here are exceptions to this general rule. … [F]ailing to pay on a regular pay date is not a per se violation" of the act. *Avalos*, 54 F.4th at 1350. "[T]he FLSA does not explicitly discuss when an employer must make these payments; it merely implies that payment must be timely under the circumstances." *Id.* at 1351. Generally, a payment will be considered timely if it is corrected "as soon as convenient or practicable under the circumstances." *Id.* at 1350, 1351 (citing *Walling v. Harnischfeger Corp.*, 325 U.S. 427, 433 (1945), marks omitted). The Federal Circuit has suggested that there must be a "substantial delay[] in payment" and that "the practices disapproved of [must have] resulted in evasions" of the act. *Id.* at 1352 (quotation marks omitted, distinguishing the case where the government paid employees three missed paychecks immediately after a government shutdown ended from cases involving one-, two-, and five-year delays); *but see Biggs,* 1 F.3d at 1538 (holding that a two-week delay violated the FLSA's prompt payment requirement).

Here, there is no dispute that Dr. Metzinger was entitled to an annual salary of $300,000 as of June 26, 2016, and that the government waited at least fifteen months, until October 2017, and at most more than three years, until November 2019, to retroactively increase her salary to that amount. ECF No. 138-1 at Appx100-01. That delay falls comfortably within the range the Federal Circuit suggested in *Avalos*, looking at either the earliest or latest possible payment date. *See Avalos*, 54 F.4th at 1350-52. Further, Dr. Metzinger alleges, her comparators received timely market pay panels, and DFAS promptly applied those increases. *See* ECF No. 153 at 42:16-43:9.

Because the government delayed payment, the burden shifts to the government to avoid paying liquidated damages. The government must show that it acted both in good faith and with a reasonable belief that it was not violating the law. 29 U.S.C. § 260; *see Laffey v. Northwest Airlines, Inc*, 567 F.2d 429, 463-64 (D.C. Cir. 1976). "To establish the requisite subjective good faith, an employer must show that it took active steps to ascertain the dictates of the FLSA and then acted to comply with them." *Shea v. United States*, 976 F.3d 1292, 1300 (Fed. Cir. 2020) (marks omitted). To establish an objectively reasonable belief, the employer must show "that it relied on a reasonable, albeit erroneous, interpretation of the FLSA or of the regulations issued thereunder." *Id.* at 1299 (quotation marks omitted).

There is at least a genuine factual dispute on both the government's good faith and its reasonable belief. The government argues that it acted in good faith because testimony from two human resources representatives shows that the fourteen-month delay in holding Dr. Metzinger's 2016 pay panel was an administrative error that was quickly corrected, three months after Dr. Metzinger filed a complaint with human resources. ECF No. 144 at 19-20 (citing ECF No. 138-1 at Appx50 [60:13-61:09], Appx89-90 [27:33-28:6]). But neither representative's statement shows

that the delay was necessarily an administrative error. One representative discussed Dr. Metzinger's SF-50s but did not address the reason for the delay. ECF No. 138-1 at Appx50 [60:13-61:09]. The other, a human resources supervisor, stated that he reported Dr. Metzinger's complaints regarding comments she received from other doctors, implying that the government at least learned about poor treatment, if not underpayments. *Id.* at Appx89-90 [27:33-28:6]. And the government does not explain why, apart from the payroll mistake, it took until November 2019 for Dr. Metzinger to receive the total back pay she was due, back to June 2016.

On the reasonable belief aspect, the government should have known, under 38 U.S.C. § 7431(c)(5), that "the amount of market pay of a physician … shall be evaluated by the Secretary not less often than once every 24 months" and that the "amount of market pay may be adjusted as the result" of that review. *See also* VA Handbook 5007/59 Part IX [¶10(a)] (Oct. 2, 2020). The law also requires that the physician be given "written notice of the results of such evaluation" and an explanation "of whether the market pay will increase … or remain unchanged following such evaluation." 38 U.S.C. § 7431(c)(5); *see also* VA Handbook 5007/59 Part IX [¶10(a), (c)]. Within Dr. Metzinger's ophthalmology department at the VA, the government was holding panels and giving market-pay increases to her male colleagues. ECF No. 99 at 17 [¶29]; *e.g.*, ECF No. 138-1 at Appx11-12 (record of market pay panel for Dr. Vincent held in 2013); ECF No. 117-2 at 12-13 (record of market pay panel held for Dr. Diamond on September 12, 2016); *id.* at 38-39 (record of market pay panel held for Dr. Carriere on September 12, 2016); *id.* at 48-49 (record of market pay panel held for Dr. Jaramillo on August 25, 2016). The government does not argue that it had reasonable grounds for believing its conduct was legal and does not cite any evidence in support. ECF No. 144 at 19-20.

Thus, there remains at least a genuine issue of material fact involving liquidated damages in an amount equal to the total amount Dr. Metzinger was underpaid between May 21, 2016, and today.[6]

### C.    Attorney's fees

Dr. Metzinger requests reasonable costs, reasonable witness fees, and attorney's fees under section 216(b). ECF No. 141 at 26-27. She argues that if she prevails on her Equal Pay Act claim, the court must award attorney's fees. *Id.* at 27. The government does not explicitly respond. *See* ECF No. 144. But because the government argues that Dr. Metzinger's Equal Pay Act claims fail, the government presumably opposes an award of attorney's fees and other costs.

Under 29 U.S.C. § 216(b), the court "shall, in addition to any judgment awarded to the plaintiff … allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." Attorney's fees appear be mandatory under the act, but only after judgment is entered for the plaintiff. *See Beebe v. United States*, 226 Ct. Cl. 308, 328-29 (1981). Because genuine disputes remain over Dr. Metzinger's claims, the court will not decide now whether or to what extent Dr. Metzinger might be entitled to recover attorney's fees.

### D.    Dr. Metzinger's request for subpoenas

After the oral argument, Dr. Metzinger moved, under RCFC 56(d), for leave to issue subpoenas to the VA and to DFAS requesting "foundational documents"—any explanations or directives—related to each change the government made to Dr. Metzinger's salary before and during

---

[6] If Dr. Metzinger is not entitled to liquidated damages, she may instead be entitled to interest. *Ford v. Alfaro*, 785 F.2d 835, 842 (9th Cir. 1986) ("It is well established in other circuits that, in the absence of a liquidated damage award, pre-judgment interest is necessary to fully compensate employees for the losses they have suffered."); *cf. Brooklyn Savings Bank*, 324 U.S. at 715-16 & n.33 (holding that, if a plaintiff receives liquidated damages, he cannot also receive interest). Thus, if there are no liquidated damages, there remains a genuine issue of material fact involving interest on Dr. Metzinger's back pay.

the relevant period. ECF Nos. 146, 146-1, 146-2, 146-5, 146-6. Dr. Metzinger requests compensation panel action forms 10-0432A, SF-52s, SF-50s, and other written communications from the VA. ECF No. 146 at 1. She requests documents from DFAS showing how it implemented the VA's directives to alter Dr. Metzinger's salary. *Id.* at 2. She argues that the absence of those documents creates a genuine issue of material fact sufficient to deny summary judgment or at least defer it until the government produces the documents. ECF No. 146 at 1-2, 9-13. Dr. Metzinger notes that the government has never filed an answer in this case and that the parties have not conducted formal discovery. ECF No. 155 at 20.

Dr. Metzinger's subpoena requests focus on DFAS's error when it set Dr. Metzinger's annual salary at $298,854 instead of $300,000 (ECF No. 146 at 3-13; ECF No. 155 at 10-12) and alleged discriminatory paychecks she received before May 2016, with a particular focus on her 2014 market pay panel (ECF No. 146 at 2-13; ECF No. 155 at 4-10, 12-18). In her view, the government "has never been able to explain where that number—298,854—came from." ECF No. 146 at 5; ECF No. 155 at 11. She offers "possible scenarios" for those changes and speculates about documents the government may possess related to her salary changes. ECF No. 146 at 2-8. According to Dr. Metzinger, the documents will resolve any factual disputes related to why and how she received the compensation and back pay she did (*id.* at 2, 10, 13) and are needed to refute the government's argument that she is not entitled to liquidated damages (ECF No. 155 at 1-4). She also raises concerns about the lack of effective date on her 2017 market pay panel recommendation. *See* ECF No. 146 at 2-5.

The government opposes Dr. Metzinger's request for subpoenas, arguing chiefly that the documents Dr. Metzinger seeks have "no bearing on the issues raised" by the government's motion. ECF No. 154 at 8-11.

Under RCFC 56(d), the court may, among other options, deny, defer ruling on, or allow time for discovery on a motion for summary judgment when a nonmovant "cannot present facts essential to justify its opposition." *See First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 265 (1968) (comparing the identical rule in the Federal Rules of Civil Procedure to other rules that allow for broad pretrial discovery). The party opposing summary judgment and seeking discovery must say why additional discovery is needed, "state with some precision the materials" it hopes to get, and explain how discovery will "rebut the movant's showing of the absence of a genuine issue of fact." *Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996) (marks and citations omitted, discussing the identical rule in the Federal Rules of Civil Procedure). The court will deny a rule 56(d) motion when the requested information "has no chance of leading to the denial of summary judgment for the movant," *RQ Squared, LLC v. United States*, 129 Fed. Cl. 742, 748 (2017), or "when the material facts are not in doubt," *Zhou v. United States*, 133 Fed. Cl. 322, 326 (2017).

Here, the parties have not yet engaged in discovery, and Dr. Metzinger will have a chance to conduct discovery on the issues that remain open in the case. But on the primary issue on which the government requests summary judgment—that Dr. Metzinger has been paid all the back pay she is entitled to from June 26, 2016, on—Dr. Metzinger's subpoena requests are futile. The documents Dr. Metzinger requests have no chance of changing that aspect of the court's legal conclusion.

Dr. Metzinger wants to know, through documents, why and "on what authority" the VA and DFAS made each change in her salary before eventually setting it at the $300,000 rate. ECF No. 146 at 12-13; ECF No. 155 at 10-12. But that information on each intermediate change is

irrelevant right now. On the back pay, the government need only show—and it has—that Dr. Metzinger was entitled to an annual salary of no more than $300,000 beginning on June 26, 2016, and that she ultimately received the back pay owed under that salary. The 2017 market pay panel decision (ECF No. 138-1 at Appx26-27) establishes the salary she was entitled to, which Dr. Metzinger does not dispute, and the government's spreadsheet establishes that she received the correct amount of back pay for her salary going back to June 26, 2016 (*id.* at Appx100-01). The documents Dr. Metzinger requests through subpoenas would not change those facts. And to the extent that Dr. Metzinger hopes the requested documents will generate inconsistencies or will support her speculative scenarios, those hopes cannot be a reason to deny summary judgment. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed. Cir. 1984).

For similar reasons, the fact that the 2017 market pay panel decision did not include an effective date (ECF No. 138-1 at Appx26-27; ECF No. 146 at 4, 13) also does not support granting Dr. Metzinger's motion. The 2017 market pay panel decision applied retroactively to June 26, 2016. *See* ECF No. 138-1 at Appx14. That is one year earlier than the date Dr. Metzinger alleges the government initially gave. ECF No. 99 at 19 [¶32] (alleging that the government initially took the position that her "salary was, or should have been, $300,000.00 effective only as of June 26, 2017" (emphasis omitted)); ECF No. 106 at 4, 9 n.5. Dr. Metzinger has the benefit of the earlier date. Dr. Metzinger may be able to seek an even earlier effective date, of May 21, 2016, but documents showing the effective date of the VA's decision would not change the fact that the government is entitled to summary judgment that Dr. Metzinger was retroactively paid her full $300,000 salary starting on June 26, 2016.

Dr. Metzinger's requests related to her 2014 market pay panel and other pay decisions made before 2016 (ECF No. 146 at 2-13; ECF No. 155 at 4-10, 12-18) also would not affect the

court's conclusion that Dr. Metzinger has received the salary-based back pay she is entitled to from June 26, 2016, on. Pay decisions before that date do not affect the determination whether the government made its payments after that date. The 2014 market pay panel documents might be relevant to evaluating the remaining month of Dr. Metzinger's Equal Pay Act claim, from May to June 2016, and could be relevant to establishing willfulness for that month or liquidated damages for the full three-year period. But Dr. Metzinger can seek that information in discovery later, without need for a subpoena now.

Furthermore, subpoenas appear to be the wrong tool. Dr. Metzinger will have time to engage in discovery. The government is the only alleged custodian of the documents she seeks. She can seek those documents directly through requests for production or interrogatories, once discovery begins.

In sum, the court will deny Dr. Metzinger's motion for leave to issue subpoenas. But the government filed its motion for summary judgment before it even answered the complaint, and discovery has not yet begun. Thus, Dr. Metzinger will have the opportunity to pursue discovery on willfulness, her pay between May 21 and June 26, 2016, liquidated damages during that period and for the period beginning on June 26, 2016, any missing benefits, and any issues related to attorney's fees and costs.

## III.    Conclusion

For the reasons stated above, this court **grants in part and denies in part** the government's motion for summary judgment. The court **denies** Dr. Metzinger's motion for leave to issue subpoenas.

The government **shall file** its answer by November 12, 2025. The parties **shall file** their joint preliminary status report under RCFC Appendix A, paragraph 4, proposing a discovery schedule and other deadlines, within 30 days after the government's answer. The court will deny

any motion to stay the case or to suspend or extend those deadlines based on the current lapse in appropriations. The court has expedited the schedule because this case has already been pending in this court for two and a half years, was filed in district court four years before that, and was filed at the EEOC even earlier; the court encourages the parties to move quickly toward a resolution.

   **IT IS SO ORDERED.**


                              /s/ Molly R. Silfen
                              MOLLY R. SILFEN
                              Judge